Filed 1/5/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CHARLES HUDEC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | S213003 |
| v. | ) | |
| | ) | Ct.App. 4/3 G047465 |
| THE SUPERIOR COURT | ) | |
| OF ORANGE COUNTY, | ) | |
| | ) | Orange County |
| Respondent; | ) | Super. Ct. No. C47710 |
| | ) | |
| THE PEOPLE, | ) | |
| | ) | |
| Real Party in Interest. | ) | |
| _____ | ) | |

A person found not guilty of a felony by reason of insanity may be committed to a state hospital for a period no longer than the maximum prison sentence for his or her offense or offenses (Pen. Code, § 1026.5, subd. (a)),[1] but the commitment may be extended if, because of mental disorder, the person "represents a substantial danger" to others (*id.*, subd. (b)(1)).  In the trial of that issue, "[t]he person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings."  (*Id.*, subd. (b)(7).)

The question presented here is whether, in such a commitment extension hearing, the individual facing extended commitment has the right to refuse to take

---

[1]     All unspecified statutory references are to the Penal Code.

the witness stand.  Like the Court of Appeal below, we conclude that by virtue of section 1026.5, subdivision (b)(7), a person facing extended commitment has the right to refuse to testify, a right constitutionally guaranteed criminal defendants.

## PROCEDURAL BACKGROUND

Charles Hudec, who suffers from paranoid schizophrenia, was found not guilty by reason of insanity of killing his father in 1981 and was committed to a state hospital for a period reflecting the maximum term for voluntary manslaughter.  In March 2012, the district attorney filed a petition to extend Hudec's commitment under section 1026.5.  The trial court denied Hudec's in limine motion to preclude his compelled testimony as a witness for the People.  On his petition for writ of mandate, the Court of Appeal issued an order to show cause, stayed the trial and, after oral argument, issued the writ, directing the superior court not to compel his testimony.  We granted the People's petition for review.

## DISCUSSION

Pursuant to section 1026.5, the district attorney may petition to extend a not guilty by reason of insanity (NGI) commitment for a felony by two years if the person "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others."  (§ 1026.5, subd. (b)(1); see *id.*, subd. (b)(8).)  The statute expressly provides the respondent with the rights to an attorney (including a public defender if the person is indigent) and a jury trial, and provides that the rules of discovery in criminal cases apply.  (*Id.*, subd. (b)(3), (4), (7).)  Finally, the statute states:  "The person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings.  All proceedings shall be in accordance with applicable constitutional guarantees."  (*Id.*, subd. (b)(7) (hereafter section 1026.5(b)(7)).)

2

Under both the United States and California Constitutions, a person has the right to refuse to answer potentially incriminating questions put to him or her in any proceeding; in addition, the defendant in a *criminal* proceeding enjoys the right to refuse to testify at all. (U.S. Const., 5th Amend.; Cal. Const., art. 1, § 15; *Allen v. Illinois* (1986) 478 U.S. 364, 368; *Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 (*Cramer*).) The question here is whether the latter right applies in a commitment extension hearing under section 1026.5.

Courts of Appeal have held commitment extension trials under section 1026.5 to be essentially civil in nature, rather than criminal, because they are directed at confinement for treatment rather than punishment. (See *People v. Angeletakis* (1992) 5 Cal.App.4th 963, 967 (*Angeletakis*).) Hudec does not dispute this characterization and does not claim he is *constitutionally* entitled to refuse to testify.[2] Rather, he claims a *statutory* right not to testify under section 1026.5(b)(7), which incorporates into an extension proceeding "the rights guaranteed under the federal and State Constitutions for criminal proceedings."

The parties each rely principally on a Court of Appeal decision: defendant on *People v. Haynie* (2004) 116 Cal.App.4th 1224 (*Haynie*), which read the

---

[2]    This court has not addressed the constitutional question as to commitment extension proceedings under section 1026.5. In *Cramer*, however, we held an intellectually disabled person (referred to, at the time, as a mentally retarded person) faced with commitment under Welfare and Institutions Code former section 6502 had no constitutional right not to be called as a witness, because of the essentially civil character of the proceedings, though he did have the right to refuse to answer potentially incriminating questions. (*Cramer*, *supra*, 23 Cal.3d at pp. 137–138.) The United States Supreme Court reached the same conclusion as to those faced with commitment under the Illinois Sexually Dangerous Persons Act. (*Allen v. Illinois*, *supra*, 478 U.S. at pp. 368–375.) As far as the decisions reveal, the statutes at issue in *Cramer* and *Allen* did not contain provisions similar to section 1026.5(b)(7).

quoted portion of section 1026.5(b)(7) as providing a commitment extension respondent with the right not to testify at the hearing, and the People on *People v. Lopez* (2006) 137 Cal.App.4th 1099 (*Lopez*), which expressly disagreed with *Haynie* and held the respondent had no right to refuse to testify. As the *Haynie* and *Lopez* courts differed critically in their assessment of prior decisions interpreting section 1026.5 and related statutes, we begin by reviewing the prior decisions and the pertinent statutes' historical development.

### I.  Statutory and Decisional History

In 1975, this court decided two cases involving the procedures constitutionally required for commitment under the (since-repealed) Mentally Disordered Sex Offender (MDSO) statutes, Welfare and Institutions Code former sections 6300 to 6332. In *People v. Burnick* (1975) 14 Cal.3d 306 (*Burnick*), we held that the due process guarantees of both the United States and California Constitutions required proof beyond a reasonable doubt in order for "the state to publicly brand a man as a mentally disordered sex offender and lock him up for an indeterminate period in a maximum security mental hospital." (*Burnick*, *supra*, at p. 310.) We relied on the United States Supreme Court's decision in *Specht v. Patterson* (1967) 386 U.S. 605, reasoning that "[i]n light of the fundamental similarity between the sexual psychopath proceedings challenged in *Specht* and in the case at bar, the question before us is whether proof beyond a reasonable doubt is among the 'full panoply of the relevant protections which due process guarantees in state criminal proceedings,' " a question we then answered affirmatively. (*Burnick*, *supra*, at p. 318.) In a companion case, *People v. Feagley* (1975) 14 Cal.3d 338, we held an MDSO committee was constitutionally entitled to a unanimous jury verdict (*id.* at pp. 349–352) and that MDSO's committed to state institutions other than hospitals (because they were deemed not amenable to

4

treatment at a state hospital) could not be confined for an indefinite period (*id.* at pp. 346, 375–376).

The Legislature responded in 1976 by providing that the term of an MDSO commitment could not exceed the maximum aggregate penal term to which the defendant could have been sentenced. (Stats. 1976, ch. 1101, § 9, p. 4977, amending Welf. & Inst. Code, former § 6316.) After enactment of the determinate sentencing law (Stats. 1976, ch. 1139), further revisions to the MDSO law were made "to provide additional safeguards against the premature release of dangerous persons." (Stats. 1977, ch. 164, § 6, p. 638.) Welfare and Institutions Code former section 6316.2, added by the 1977 legislation, created a standard and procedure for annual extended commitments beyond the initial maximum term of commitment set by former section 6316.1. Such an extended commitment could be made if the person suffered from a mental disorder so predisposing him or her to commission of sexual offenses as to present a serious threat of harm to others. (Welf. & Inst. Code, former § 6316.2, subd. (a).)

Under the new 1977 procedure for an extended MDSO commitment, the rules of criminal discovery applied, the defendant had a right to appointed counsel if indigent, and trial was by jury unless waived. (Welf. & Inst. Code, former § 6316.2, subds. (d), (e), added by Stats. 1977, ch. 164, § 3, p. 634.) Moreover, the new section provided: "*The patient shall be entitled to the rights guaranteed under the Federal and State Constitutions for criminal proceedings.* All proceedings shall be in accordance with applicable constitutional guarantees." (*Id.*, subd. (e), italics added.) The 1977 MDSO revisions were intended to "establish[] a practical and reasonable system for extending commitments on a year-by-year basis for MDSO's who continue to be dangerous" while making "provisions for due process" and for "representation of all concerned parties."

(Health & Welf. Agency, Enrolled Bill Rep. on Sen. Bill No. 1178 (1977–1978 Reg. Sess.) June 29, 1977, p. 2.)

In *In re Moye* (1978) 22 Cal.3d 457, 467, we held equal protection principles demanded that initial NGI commitments, like those under the MDSO laws, be limited to "the maximum term of punishment for the underlying offense." Relying on the 1977 amendments to the MDSO scheme, we held initial NGI commitments must be limited as in Welfare and Institutions Code former section 6316.1 to the maximum term of penal confinement, but that NGI commitments could be extended under standards and procedures conforming "[t]o the extent practicable, and in the absence of further legislation on the subject," to those in Welfare and Institutions Code former section 6316.2. (*Moye*, *supra*, at p. 467.)

Further legislation was not long in coming. In 1979, the Legislature enacted Penal Code section 1026.5, limiting initial NGI commitments and providing for commitment extensions. As in Welfare and Institutions Code former section 6316.2, Penal Code section 1026.5 provides that in commitment extension proceedings the rules of criminal discovery apply, indigent defendants have the right to appointed counsel, and trial is by jury unless waived. (§ 1026.5, subd. (b)(3), (4), (7).) And, in language almost identical to that in Welfare and Institutions Code former section 6316.2, subdivision (e), the NGI statute states: "*The person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings.* All proceedings shall be in accordance with applicable constitutional guarantees." (§ 1026.5(b)(7), italics added.)

Legislative history confirms section 1026.5 was enacted in response to *Moye*; as we had held was required by equal protection, the new statute set limits on initial NGI commitments, while allowing extensions using a standard and procedures similar to those for MDSO's. (Assem. Off. of Research, 3d reading analysis of Sen. Bill No. 1022 (1979–1980 Reg. Sess.) Sept. 11, 1979, p. 1;

6

Assem. Com. on Crim. Justice, Analysis of Sen. Bill No. 1022 (1979–1980 Reg. Sess.) as amended July 3, 1979, pp. 1–2.) In an extension hearing under the new statute, the respondent would have "full jury trial criminal rights." (Assem. Off. of Research, 3d reading analysis of Sen. Bill No. 1022 (1979–1980 Reg. Sess.), Sept. 11, 1979, p. 1.) Describing the commitment extension procedure, another analysis stated: "All rights that apply in criminal trials apply for these hearings (right to counsel, discovery, unanimous jury verdicts, etc.)." (Assem. Com. on Crim. Justice, Analysis of Sen. Bill No. 1022 (1979–1980 Reg. Sess.), as amended July 3, 1979, p. 2.)

Despite the facially broad language of Welfare and Institutions Code former section 6316.2, subdivision (e), and Penal Code section 1026.5(b)(7), a series of appellate decisions has read the statutes more narrowly as incorporating not all, but only a subset of the constitutional rights enjoyed by criminal defendants.

In *People v. Henderson* (1981) 117 Cal.App.3d 740 (*Henderson*), an MDSO committee claimed the trial court violated his constitutional and statutory rights by admitting, at his extension hearing, his statements to state hospital staff to the effect that he was sexually stimulated by violence. The appellate court first rejected the constitutional self-incrimination claim on the ground that admission of the statements in an extension hearing could not be incriminatory, since the proceeding was limited to the issue of the defendant's mental disorder and predisposition to commit sexual offenses and would not result in a penal sanction. (*Id.* at pp. 746–747.) Turning to the statutory claim founded on Welfare and Institutions Code former section 6316.2, subdivision (e), the court read the statute as not mandating application of the privilege against self-incrimination in the case before it. "Subdivision (e) of section 6316.2 codifies the application of constitutional protections to MDSO proceedings mandated by judicial decision (see, e.g., *People v. Burnick*, *supra*[, 14 Cal.3d 306]; *People v. Feagley*, *supra*[, 14

7

Cal.3d 338]).  It does not extend the protection of the constitutional privileges against self-incrimination to testimonial communications which are not incriminatory." (*Henderson*, *supra*, at p. 748.)

*People v. Superior Court (Williams)* (1991) 233 Cal.App.3d 477 (*Williams*) restated *Henderson*'s reading and extended it to section 1026.5(b)(7).  In holding that double jeopardy guarantees did not preclude retrial of an NGI commitment extension petition after reversal of a nonsuit granted by the trial court, the appellate court rejected the argument that double jeopardy protections were incorporated by statute into the extension proceeding:  "It is clear . . . that although many constitutional protections relating to criminal proceedings are available in extension proceedings, the application of all such protections is not mandated by section 1026.5.  *The statutory language merely codifies the application of constitutional protections to extension hearings mandated by judicial decision.  It does not extend the protection of constitutional provisions which bear no relevant relationship to the proceedings.  (People v. Henderson (1981) 117 Cal.App.3d 740, 748.)*  . . .  [¶] Since, as we have concluded in connection with our discussion of the constitutional principles, double jeopardy provisions can have no meaningful application to extension proceedings which are civil in nature, are for the purpose of treatment not punishment, and are not an adjudication of a criminal act or offense, we hold that double jeopardy provisions are not applicable to extension proceedings by virtue of the language of the statute." (*Williams*, *supra*, at p. 488, italics added.)

In *People v. Powell* (2004) 114 Cal.App.4th 1153 (*Powell*), the court quoted and relied on *Williams*'s conclusion that section 1026.5(b)(7) " 'merely codifies the application of constitutional protections to extension hearings mandated by judicial decision.' " (*Powell*, *supra*, at p. 1158, quoting *Williams*, *supra*, 233 Cal.App.3d at p. 488.)  Based on that reading and its own sense as to how an

8

extension hearing should be conducted, the court held an NGI extension hearing respondent did not have the right to be tried by a jury unless personally waived. "An insane person who is 'a substantial danger of physical harm to others' (§ 1026.5, subd. (b)(1)) should not be able to veto the informed tactical decision of counsel. . . . [¶] Appellant has twice been adjudged to be insane and state hospital doctors have never indicated that he has regained his sanity. He seeks release so that he can kill people. . . . [¶] Common sense dictates that appellant should not be able to veto his attorney's decision to waive jury." (*Powell*, *supra*, at p. 1158; see *Angeletakis*, *supra*, 5 Cal.App.4th 963, 969–971 [following *Williams* to hold respondent under § 1026.5 has no right not to be tried while mentally incompetent].)

*Haynie*, *supra*, 116 Cal.App.4th 1224, which as here dealt with the right not to be called as a witness, broke the chain of narrow interpretations. Over Haynie's objection, the prosecution in his commitment extension hearing was permitted to call him in its case-in-chief; on appeal, he contended he should not have been compelled to testify. The *Haynie* court agreed under the authority of section 1026.5(b)(7). (*Haynie*, at pp. 1227–1230.)

*Haynie* relied primarily on the statute's plain language, reasoning: "Here, the Legislature's words clearly and unambiguously state the person 'is entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings.' A defendant in a criminal matter has an absolute right not to be called as a witness and not to testify. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15; Evid. Code, § 930.) Under the plain language of the statute, because Haynie is entitled to the same rights guaranteed to a criminal defendant, he should not have been compelled to testify in the prosecution's case at his commitment extension trial." (*Haynie*, *supra*, 116 Cal.App.4th at p. 1228.)

9

Reviewing the narrowing decisions discussed above, *Haynie* expressed agreement with *Williams* that "the statutory language of section 1026.5 does not extend the 'protection of constitutional provisions which bear no relevant relationship to the proceedings' " (*Haynie*, *supra*, 116 Cal.App.4th at p. 1229), but disagreed with *Williams*'s "broad statement . . . that the statutory language 'merely codifies the application of constitutional protections to extension hearings mandated by judicial decision' " (*Haynie*, at p. 1230). That interpretation, *Haynie* reasoned, renders the statutory grant of rights superfluous and "supplants the legislative rights-inclusive language with a process whereby judges select which rights will apply." (*Ibid*.)

On the application of section 1026.5(b)(7) to the issue of compelled testimony in an extension hearing, *Haynie* concluded the right not to testify is "clearly and relevantly implicated when a person is called by the state to testify in a proceeding to recommit him or her even if what is said on the witness stand is not per se incriminating." (*Haynie*, *supra*, 116 Cal.App.4th at p. 1230.) Unable to find the respondent's compelled testimony was harmless in the extension hearing, the appellate court reversed the commitment extension order. (*Id.* at pp. 1230–1231; cf. *In re Luis C.* (2004) 116 Cal.App.4th 1397, 1402–1403 [applying *Haynie* to extension of a juvenile commitment under Welf. & Inst. Code § 1801.5, which provides that the juvenile "shall be entitled to all rights guaranteed under the federal and state constitutions in criminal proceedings"]; accord, *Joshua D. v. Superior Court* (2007) 157 Cal.App.4th 549, 558–562 (*Joshua D.*).)

This brings us to *Lopez*, *supra*, 137 Cal.App.4th 1099, on which the People principally rely. In *Lopez*, the issue of an NGI extension defendant's right not to testify arose only indirectly; at issue was not an NGI extension but rather a petition for recommitment under the Mentally Disordered Offender (MDO) law. (§§ 2960–2981; see § 2972 [procedure for hearing on recommitment].) The

10

defendant argued that the admission of his testimony at the recommitment hearing denied him equal protection of the law because, under the statutes construed in *Haynie* and *Luis C.*, respondents in NGI and juvenile commitment extension cases could not be compelled to testify.  (*Lopez*, *supra*, at pp. 1105–1106.)

The *Lopez* court rejected the equal protection claim by disagreeing with *Haynie* and *Luis C.* on their interpretations of the NGI and juvenile commitment statutes.  *Lopez* criticized *Haynie* for not sufficiently addressing *Henderson*'s holding that admission of an MDSO defendant's statements did not violate his rights under Welfare and Institutions Code former section 6316.2, subdivision (e).  (*Lopez*, *supra*, 137 Cal.App.4th at pp. 1110–1111.)  *Haynie*, the *Lopez* court asserted, failed to account for the fact "that *Henderson* had concluded identical language to that found in section 1026.5(b)(7) did not grant a committee the self-incrimination privilege enjoyed by a criminal defendant."  (*Lopez*, *supra*, at p. 1111.)

*Lopez* also faulted *Haynie* for an assertedly contradictory approach to the plain language of section 1026.5(b)(7).  On the one hand, *Lopez* noted, *Haynie* relied on the statute's clear and unambiguous language providing an NGI extension respondent the constitutional rights of a criminal defendant; on the other hand, *Haynie* agreed with *Williams* that that language did not include rights with no "relevant relationship" to commitment proceedings.  (*Lopez*, *supra*, 137 Cal.App.4th at p. 1115.)  "However, if the [*Haynie*] court actually meant to apply section 1026.5(b)(7) literally, it should not have engaged in any further analysis" beyond applying the statute's plain language.  (*Ibid*.)

Having accepted *Williams*'s "nonliteral" reading of section 1026.5(b)(7), *Lopez* went on to conclude the right not to testify has no relevant relationship to NGI commitment extension proceedings because, like other civil commitment proceedings, they "are not criminal proceedings, do not involve adjudication of

11

guilt, and do not result in punishment." (*Lopez*, *supra*, 137 Cal.App.4th at p. 1116.)  For this aspect of its reasoning, *Lopez* relied mainly on our decision in *Cramer*, *supra*, 23 Cal.3d 131, that intellectually disabled persons facing commitment had no constitutional right to refuse to testify.  (*Lopez*, *supra*, at p. 1116.)

## II.  Analysis

The Court of Appeal below, agreeing with *Haynie*, rested its decision primarily on the language of section 1026.5(b)(7), which it found unambiguously provided commitment extension respondents the right not to testify.  The court criticized *Lopez* for "lean[ing] heavily on policy arguments, with scant attention to the statutory language."  Hudec, similarly, argues the language of section 1026.5(b)(7) is clear, its application to the present facts "is not repugnant to the general purview of the act, and there is no compelling reason to disregard the plain language."  The People argue the lower court's "literal interpretation of section 1026.5(b)(7) would produce absurd consequences" and that *Lopez* correctly applied *Williams*'s "relevant relationship" standard to determine the statute afforded respondents no right to refuse to testify.

We agree with Hudec and the Court of Appeal below that a respondent has a statutory right not to testify at his or her NGI commitment extension hearing.  On its face, the language of section 1026.5(b)(7) provides respondents in commitment extension hearings the rights constitutionally enjoyed by criminal defendants.  One of those rights is the right to refuse to testify in the prosecution's case-in-chief.  (*Allen v. Illinois*, *supra*, 478 U.S. at p. 368.)  And while the appellate courts have posited a number of restrictions on the rights included under section 1026.5(b)(7), we find none of those possible restrictions justifies excluding the right not to testify against oneself.

12

Although Penal Code section 1026.5(b)(7) does not expressly grant NGI extension respondents "all" the rights of a criminal defendant, as Welfare and Institutions Code section 1801.5 does for juveniles in extension hearings, it uses similarly unqualified language. As the appellate court below put it, "Here, the Legislature bestowed upon potential committees '*the* rights guaranteed under the federal and State Constitutions for *criminal proceedings*,' not '*some* of the rights,' or 'the due process rights required by judicial decision in commitment extension proceedings.' " Used as a definite article, "the" has a specifying or particularizing function. (Random House Dict. of the English Language (2d ed. 1987) p. 1965.) Here, it serves to specify a set of rights—those constitutionally guaranteed in criminal proceedings—but it does not imply or suggest any further limitation within that designated set. In this context, "the" can be read as equivalent to "all."

Despite this apparent clarity, interpreting section 1026.5(b)(7) poses a degree of inherent difficulty. By its terms, the statute in effect commands a translation or transposition of procedural rights from the criminal context to the noncriminal, contexts sufficiently different to raise a question of its interpretation. That the appellate courts have struggled to delineate the set of criminal trial rights the statute incorporates into a commitment extension hearing is not surprising.

In a potentially sweeping restriction, the *Lopez* court appeared to read section 1026.5(b)(7) as excluding all rights constitutionally originating in or tied to criminal proceedings. *Lopez* reasoned that because the right of a defendant not to testify serves constitutionally to maintain the accusatorial (as opposed to inquisitorial) character of " 'the *criminal* justice system' " (*Lopez*, *supra*, 137 Cal.App.4th at p. 1116, quoting *Cramer*, *supra*, 23 Cal.3d at p. 137), and NGI commitment extension hearings are not criminal proceedings, the right not to testify is irrelevant and inapplicable in a section 1026.5 hearing. (*Lopez*, *supra*, at pp. 1115–1116.)

13

*Lopez*'s analysis is contrary to the statutory language and history. In granting NGI commitment extension respondents "the rights guaranteed under the federal and State Constitutions for criminal proceedings" (§ 1026.5(b)(7)), the Legislature could not have meant to *exclude* all rights whose application is constitutionally mandated in the criminal justice system; the result would render the statutory provision a nullity. Historically, *Lopez*'s premise that constitutional rights originating in the criminal context are excluded from the statutory grant clashes with the statute's origins as a response to *Burnick* and *Feagley*, which likened involuntary commitment proceedings under the MDSO law to criminal prosecutions, and to *Moye*, which extended the resulting MDSO procedural protections to NGI committees. *Lopez* clashes as well as with legislative history indicating the new law would provide respondents "full jury trial criminal rights" (Assem. Off. of Research, 3d reading analysis of Sen. Bill No. 1022 (1979–1980 Reg. Sess.) Sept. 11, 1979, p. 1), including "[a]ll rights that apply in criminal trials . . . (right to counsel, discovery, unanimous jury verdicts, etc.)" (Assem. Com. on Crim. Justice, Analysis of Sen. Bill No. 1022 (1979–1980 Reg. Sess.) as amended July 3, 1979, p. 2).

Almost as restrictive in effect is the *Williams* court's assertion that section 1026.5(b)(7) "merely codifies the application of constitutional protections to extension hearings mandated by judicial decision." (*Williams*, *supra*, 233 Cal.App.3d at p. 488.) For this construction, *Williams* cited only *Henderson*, *supra*, 117 Cal.App.3d at page 748. But *Henderson*, construing the virtually identical language of Welfare and Institutions Code former section 6316.2, subdivision (e), does not stand for the principle that this language refers *only* to those constitutional rights specifically mandated for MDSO's by judicial decision. *Henderson* observed that Welfare and Institutions Code former section 6316.2, subdivision (e) "codifies" the mandates of *Burnick* and *Feagley*, not that it *merely*

14

codified those decisions. (*Henderson*, *supra*, at p. 748.) The court then concluded, somewhat tautologically, that the statute did not extend the privilege against self-incrimination to communications "which are not incriminatory." (*Ibid.*) *Henderson* did not articulate a sweeping restriction of the type for which the *Williams* court cited it. (See *Joshua D.*, *supra*, 157 Cal.App.4th at p. 561 ["The court in *Henderson* concluded simply that the asserted privilege against self-incrimination did not apply to the defendant's communications with hospital staff in that case because they were not inculpatory."].)

*Williams*'s construction of section 1026.5(b)(7) as merely codifying judicial decisions applying constitutional rights piecemeal is not only unsupported by *Henderson*, the only authority cited, but is also contrary to the legislative intent evident in the statutory language. As observed in *Haynie*, *supra*, 116 Cal.App.4th at page 1230, "if the courts have granted rights to committees under case law, there is no need for the statutory declaration of rights—it is surplusage." Such a construction is, of course, to be avoided if possible (*People v. Hudson* (2006) 38 Cal.4th 1002, 1010), and nothing in the statute's history suggests the Legislature intended mere codification of judicial decisions. In enacting Welfare and Institutions Code former section 6316.2, subdivision (e), and then Penal Code section 1026.5(b)(7), the Legislature was, to be sure, responding to decisions from this court recognizing constitutional due process protections for certain classes of involuntary committees. But in providing broadly that in both MDSO and NGI commitment extensions the individual would have "the rights guaranteed under the federal and State Constitutions for criminal proceedings." (§ 1026.5, subd. (b)(7); Welf. & Inst. Code, former § 6316.2, subd. (e)), the Legislature chose not merely to codify the particular rights mandated by *Burnick*, *Feagley* and *Moye*— limited commitment terms, proof beyond a reasonable doubt, and a unanimous

15

jury verdict—but rather to state a broader rule that MDSO and NGI commitments call for procedural protections otherwise applicable in criminal cases.[3]

The People contend a literal reading of section 1026.5(b)(7) would have absurd results. We may, of course, reject a literal statutory construction where it would result in absurd consequences the Legislature could not have intended. (*People v. Leiva* (2013) 56 Cal.4th 498, 506; *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 27.) Where a right applicable in criminal proceedings cannot logically be provided within the framework of an NGI commitment extension hearing, we might infer the Legislature could not have meant for section 1026.5(b)(7) to encompass it.

A possible example of this type of absurdity is the right not to be tried while mentally incompetent. If a section 1026.5 extension hearing could not proceed until any doubts about the respondent's competence were resolved, the issue of an NGI respondent's continuing mental illness, central to the hearing under section 1026.5, subdivision (b)(1), would tend to be subsumed within nonstatutory proceedings on mental competence, and the hearing called for by section 1026.5 could be indefinitely delayed. (Cf. *Moore v. Superior Court* (2010) 50 Cal.4th 802, 808 [declining to recognize a due process competence right for Sexually Violent Predator Act defendants in part because such a right "could prevent an SVP determination from being made *at all*"]; see *Angeletakis*, *supra*, 5 Cal.App.4th at pp. 970–971 [§ 1026.5(b)(7) does not incorporate right not to be

---

**3** *Powell* and *Angeletakis* thus erred in relying on *Williams*'s interpretation of section 1026.5(b)(7), as merely codifying judicial decisions holding certain rights applicable in commitment extension hearings. (*Powell*, *supra*, 114 Cal.App.4th at pp. 1157–1158; *Angeletakis*, *supra*, 5 Cal.App.4th at p. 970.) We disapprove *People v. Superior Court (Williams)*, *supra*, 233 Cal.App.3d 477, *People v. Powell*, *supra*, 114 Cal.App.4th 1153, and *People v. Angeletakis*, *supra*, 5 Cal.App.4th 963, to this extent.

16

tried while incompetent].) Arguably, the Legislature did not intend to create such a contradictory set of procedures by its grant of rights in section 1026.5(b)(7).

No such inconsistency or absurdity is involved, however, in an NGI commitment extension respondent's exercise of the right to refuse to testify. No nonstatutory procedures need be contrived to implement this right, and its recognition will not tend to prevent a section 1026.5 proceeding from going forward. The prosecution in an extension hearing does not typically depend solely on the respondent's testimony; before an NGI extension petition can even come to hearing, the prosecution must submit affidavits providing a factual basis to support the findings required for extension. (§ 1026.5, subd. (b)(2).) In the present case, the prosecution, according to its trial brief, intends to meet its burden of proof in part through the testimony of both mental health professionals who have treated Hudec and a psychologist appointed to evaluate him. In *Haynie*, the respondent's "treating psychiatrists testified he suffered from a major schizo-affective disorder, bipolar type. The disorder made him dangerous because during his manic phases, which were chronic, he was irritable, angry, and paranoid." (*Haynie*, *supra*, 116 Cal.App.4th at p. 1227; see also *Lopez*, *supra*, 137 Cal.App.4th at pp. 1103–1104 [similar testimony from treating physicians].) Recognizing that NGI commitment extension respondents may refuse to testify will deprive the prosecution in some cases of desired evidence, but it will not as a general matter preclude section 1026.5 extensions. Interpreting section 1026.5(b)(7) to include the right not to testify does not result in absurd consequences.

Beyond the possibility of absurd consequences from a literal construction, the People argue for the idea, first posited in *Williams*, that constitutional rights bearing no "relevant relationship" to commitment extension proceedings are not included in the granting language of section 1026.5(b)(7) and Welfare and Institutions Code former section 6316.2, subdivision (e). (*Williams*, *supra*, 233

17

Cal.App.3d at p. 488.) What the *Williams* court exactly meant by "relevant relationship" is not clear, but the court appeared to use the phrase synonymously with "meaningful application." (See *ibid.*) *Williams* reasoned that because section 1026.5 extension proceedings "are not an adjudication of a criminal act or offense," the first commitment extension hearing in *Williams* never placed the respondent in jeopardy of penal liability; double jeopardy protections therefore had no "meaningful application" to such proceedings. (*Williams*, *supra*, 233 Cal.App.3d at p. 488; see also *id.* at p. 487.)

Whether or not this reasoning justified the result in *Williams*, a question we do not face here, the same logic does not serve in this case. The right not to testify in a proceeding where one is a defendant is a right that *could* meaningfully apply in any type of adversarial proceeding, though only in criminal cases is it constitutionally guaranteed. In contrast to double jeopardy protections as they were viewed in *Williams*, the right not to testify does not take its very meaning from the criminal context, nor does applying it when the prosecution seeks to compel the respondent's testimony in an NGI commitment extension hearing present any logical difficulty. As the *Haynie* court concluded, "The right to not be compelled to testify against oneself is clearly and relevantly implicated when a person is called by the state to testify in a proceeding to recommit him or her even if what is said on the witness stand is not per se incriminating." (*Haynie*, *supra*, 116 Cal.App.4th at p. 1230.) Again, no grounds exist to find on this basis that the Legislature did not intend the right to refuse to testify to be included in section 1026.5(b)(7)'s broad grant.

Arguing against the existence of a relevant relationship between the right not to testify and section 1026.5 hearings, the People assert "the ability to hear and observe the person's testimony in a civil commitment hearing is particularly helpful" in determining his or her mental condition. As the People observe, in

18

*Cramer*, *supra*, 23 Cal.3d at page 139, we relied on similar considerations to conclude that those faced with commitment as intellectually disabled persons who pose a danger to themselves or others had no constitutional right to refuse to testify. But *Cramer*'s constitutional reasoning has no bearing on the interpretation of section 1026.5(b)(7). Granting that trial accuracy considerations arguably support compelling a committee's testimony, other considerations could be viewed as militating against such compulsion, notably "our sense of fair play which dictates 'a fair state-individual balance by requiring the government . . . in its contest with the individual to shoulder the entire load.' " (*Murphy v. Waterfront Comm'n.* (1964) 378 U.S. 52, 55.) The structure of a commitment extension hearing under section 1026.5, including the choice to grant commitment extension respondents full criminal trial rights, reflects a legislative effort to prescribe procedures fair to both the respondent and the People. The Legislature having made that set of policy choices in section 1026.5(b)(7), and there being no claim the statute is itself unconstitutional, it is not for the courts to reweigh the competing considerations. (See *Joshua D.*, *supra*, 157 Cal.App.4th at p. 565.)

Finally, the People contend *Lopez* correctly relied on *Conservatorship of Bones* (1987) 189 Cal.App.3d 1010 (*Bones*), which held a person facing confinement for involuntary treatment under certain provisions of the Lanterman-Petris-Short Act (Welf. & Inst. Code, §§ 5000–5550) does not have a statutory right to refuse to testify despite a statutory command that the proceedings are to be conducted " 'in accordance with constitutional guarantees of due process of law and the procedures required under Section 13 of Article 1 of the Constitution of the State of California' [Welf. & Inst. Code, § 5303]." (*Bones*, *supra*, at p. 1016; see *Lopez*, *supra*, 137 Cal.App.4th at pp. 1112–1113.)

Tracing the references in Welfare and Institutions Code section 5303, *Bones* explained that while at the time that statute was enacted, article I, section 13 of our

state Constitution included the freedom from compelled testimony against oneself in a criminal case (along with due process and double jeopardy protections), section 13 had since been repealed and the self-incrimination guarantee placed in section 15 of the same article, while the due process guarantee went to section 7, subdivision (a) of that article. (*Bones*, *supra*, 189 Cal.App.3d at p. 1016.) *Bones* observed that this court in *Burnick*, *supra*, 14 Cal.3d 306, had cited section 7, subdivision (a) in a bracketed reference,**4** and inferred from that reference we believed Welfare and Institutions Code section 5303's reference was to due process alone and hence "the effect of section 5303 is merely to emphasize the applicability of due process principles and not to incorporate the whole panoply of criminal defense rights." (*Bones*, *supra*, at p. 1016.) Adopting *Bones*'s analysis of *Burnick*'s bracketed reference, the *Lopez* court inferred the Legislature acted with the same limited intent in enacting section 1026.5(b)(7), that is, merely to grant by statute the same due process rights constitutionally guaranteed to NGI extension respondents. (*Lopez*, *supra*, 137 Cal.App.4th at pp. 1113–1114.)

We have already explained the conflicts between this construction of section 1026.5(b)(7) as a mere codification of due process principles and the statute's

---

**4** In *Burnick*, addressing whether due process requires application of a heightened standard of proof to involuntary commitment hearings under the MDSO law, we made this comparison in a footnote: "Similarly, the Legislature has not specified the standard of proof for involuntary commitment of persons under our general mental health law (Welf. & Inst. Code, § 5000 et seq., known as the Lanterman-Petris-Short Act), but has provided that such proceedings shall be conducted 'in accordance with constitutional guarantees of due process of law and the procedures required under Section 13 [now § 7, subd. (a)] of Article 1 of the Constitution of the State of California.' (§ 5303.) As in the case at bar, it will be for the courts to decide which standard of proof is necessary to comport with those 'guarantees and procedures' in view of the consequences to the individual of a commitment under the Lanterman-Petris-Short Act." (*Burnick*, *supra*, 14 Cal.3d at p. 314, fn. 5.)

20

language and history, and *Bones* does nothing to shake our conclusion it must be rejected. *Bones*'s reading of our citation in *Burnick* as a subtle, cryptic dictum limiting the scope of Welfare and Institutions Code section 5303 so as to exclude the right to refuse to testify—a subject not even remotely before the *Burnick* court—is highly implausible. Rather, the citation appears intended simply as an aid to the *Burnick* reader in locating the current constitutional provision guaranteeing due process—the constitutional right that was under discussion in *Burnick*. In any event, Welfare and Institutions Code section 5303 employs different language and has a different history than section 1026.5(b)(7), the statute at issue here, and *Bones*'s conclusions on the former are not persuasive as to the latter. (See *Joshua D.*, *supra*, 157 Cal.App.4th at p. 562.)[5]

### III. Conclusion

By its terms, section 1026.5(b)(7) provides that NGI committees facing a commitment extension hearing enjoy the trial rights constitutionally guaranteed to criminal defendants, which include the right to refuse to testify in the People's case-in-chief. Recognizing the application of that right in the commitment extension context does not result in any absurd consequence; nor have we found any other sufficient ground to depart from the statutory language in applying the right not to testify to hearings under section 1026.5.

---

[5] *People v. Lopez, supra*, 137 Cal.App.4th 1099, is disapproved to the extent that it held the right to refuse to testify is excluded from the grant of rights in section 1026.5(b)(7).

21

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**BAXTER, J.**[*]
**EPSTEIN, J.**[**]

---

[*]     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[**]     Presiding Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Hudec v. Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 218 Cal.App.4th 311
**Rehearing Granted**


_____

**Opinion No.** S213003
**Date Filed:** January 5, 2015

_____

**Court:** Superior
**County:** Orange
**Judge:** Kazuharu Makino


_____

**Counsel:**

Frank Ospino, Public Defender, Jean Wilkinson, Chief Deputy Public Defender, Mark S. Brown, Assistant Public Defender, and Christopher D. McGibbons, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Tony Rackauckas, District Attorney, and Brian F. Fitzpatrick, Deputy District Attorney, for Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christopher D. McGibbons
Deputy Public Defender
14 Civic Center Plaza
Santa Ana, CA  92701-4029
(714) 834-2144

Brian F. Fitzpatrick
Deputy District Attorney
P.O. Box 165480
Santa Ana, CA  92702
(714) 347-8789